## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK
### BROOKLYN COURTHOUSE

| | |
|---|---|
| DONNA BAIRD, individually and on behalf of all others similarly situated,<br><br>               Plaintiff,<br><br>        - against -<br><br>DEL MONTE FOODS INC.,<br>              Defendant | 1:24-cv-02129<br><br><br>Class Action Complaint<br><br>Jury Trial Demanded |

Donna Baird ("Plaintiff") alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

## I. DEMAND FOR "REAL INGREDIENTS" WITHOUT ADDITIVES

1. According to a food industry executive, "Consumers are reading product labels more closely, and we are seeing the effects of a simple food movement when it comes to ingredients."

2. Consumer research company Mintel attributed this demand for "real ingredients" in part due to media attention focused on lack of transparency in the food industry.[1]

3. This sentiment is reflected in the public's growing aversion to additives.

4. Additives refer to non-food ingredients created in laboratories to fulfill

---

[1] Lynn Dornblaser, Director, Innovation & Insight, Mintel, "Clean Label: Why this Trend is Important Now," 2017.

various functions, such as facilitating processing ("processing aids"), improving appearance ("colorants"), creating or enhancing taste ("flavorings") and extending shelf-life and slowing deterioration ("preservatives").

5.      According to one observer, "Our foods are laden with additives that are meant to enhance flavor, color and shelf life that research has shown are either bad for people to consume or inconclusively so."[2]

6.      A recent consumer survey by the International Food Information Council ("IFIC") found that almost thirty percent of the public consider additives in food a top concern.[3]

7.      This aversion to additives is based on the belief that chemicals of any kind are not necessarily safe and may pose health risks.[4]

8.      This behavior makes sense, as studies have confirmed negative health effects linked to foods laden with chemical additives.[5]

9.      A growing number of consumers seek foods marketed with components

---

[2] Frank Giustra, You Might Be Surprised by What's in Your Food, Modern Farmer, Feb. 8, 2021.

[3] Tom Neltner, Environmental Defense Fund, Chemicals Policy Director, Chemicals in food continue to be a top food safety concern among consumers, Food Navigator, Sept. 20, 2021.

[4] Cary Funk et al., Public Perspectives on Food Risks, Pew Research Center, Nov. 19, 2018.

[5] Bhavana Kunkalikar, Processed danger: Industrial food additives and the health risks to children, News-Medical.net, May 23, 2023 (citing recent study in the Journal of the Academy of Nutrition and Dietetics, researchers explore the potential adverse health effects on children due to the use of industrial additives in processed food).

and ingredients indicated with the term, "100% _____ ," understanding this as consistent with its dictionary definitions of "completely" or "entirely," without anything else added, with respect to the substance following the "100%."[6]

10.   Ingredient supplier Corbion observed that consumer awareness of the potentially harmful effects of additives means they are increasingly seeking foods that "use 'real' ingredients, which is to say, those that are recognizable" and "naturally occurring," like fruit and 100 percent fruit juice.[7]

11.   This is because shoppers feel more comfortable when foods they buy are similar to what they have in their refrigerators, instead of complex ingredients made in laboratories by chemists.

## II.   LEGAL BACKGROUND

12.   In response to an unregulated environment, where companies marketed their foods as containing the fruits and 100% fruit juice valued by consumers yet substituted ingredients of lesser economic and nutritive value, the Pure Food and Drug Act of 1906 established rules to protect the public.

13.   These requirements were strengthened by the Federal Food, Drug and Cosmetic Act ("FFDCA") in 1938. 21 U.S.C. § 301 *et seq.*

---

[6] https://dictionary.cambridge.org/us/dictionary/english/one-hundred-percent
https://www.yourdictionary.com/one-hundred-percent
[7] John Unrein, Ingredients on Alert: How Consumer Demand is Influencing Baking's Future, Bake Mag, Aug. 19, 2020.

14.    This State adopted these laws through its Agriculture and Markets Law ("AGM") and accompanying regulations. AGM § 198 *et seq*., Article 17, Adulteration, Packing, and Branding of Food and Food Products.[8]

15.    New York considered these requirements for the sale and marketing of foods necessary to prevent unscrupulous and fraudulent practices, facilitate selection and consumption of food according to sound dietary and nutritional principles, and improve its citizens' overall health. AGM § 3.

16.    The Legislature deemed these laws "an exercise of the police power of the state and a discharge of its obligations for the promotion of the general welfare," requiring they "receive a liberal interpretation and application in furtherance of the aforesaid policy and purposes," and enforced by methods including "individual enterprise." AGM § 3.

17.    Congress empowered the Food and Drug Administration ("FDA") to develop rules, "premised on the simple notion that consumers value 'the real thing' versus a close substitute and should be able to rely on the label to readily distinguish

---

[8] Official Compilation of Codes, Rules and Regulations of  the State of New York ("N.Y.C.R.R."), Title 1, Department of Agriculture and Markets, Chapter VI, Food Control, Subchapter C, Food and Food Products (Article 17, Agriculture and Markets Law), 1 N.Y.C.R.R. § 250.1 *et seq*.; 1 N.Y.C.R.R. § 259.1(a) (adopting Parts 100, 101 and 102 of Title 21); 1 N.Y.C.R.R. § 250.1(a) (adopting all "Federal definitions and standards").

between the two."[9]

18.   Given that manufacturers of that era were using advanced scientific knowledge to substitute ingredients of lesser economic and nutritive value for the wholesome ingredients sought by the public, this was a daunting task.

19.   These principles were especially important for commonly consumed foods, for which "standards of identity" were established.

20.   These standards protected consumers, by ensuring their characteristics, ingredients and production processes were consistent with what they expected.

21.   Since "consumers initially [] rely on extrinsic cues such as visual information on labels and packaging" to provide sensory and nutritive information about what they were buying, the labeling of these foods had to provide specific, complete, and truthful information.[10]

## III.  PRODUCT LABELING

22.   To appeal to the growing number of consumers seeking foods that "use 'real' ingredients, which is to say, those that are recognizable," consisting of components entirely of those ingredients, instead of lesser valued substitutes and

---

[9] Steven Steinborn, Hogan & Hartson LLP, Regulations: Making Taste Claims, PreparedFoods.com, August 11, 2006.

[10] Lancelot Miltgen et al., "Communicating Sensory Attributes and Innovation through Food Product Labeling," Journal of Food Product Marketing, 22.2 (2016): 219-239; Helena Blackmore et al., "A Taste of Things to Come: The Effect of Extrinsic and Intrinsic Cues on Perceived Properties of Beer Mediated by Expectations," Food Quality and Preference, 94 (2021): 104326.

manufactured chemical compounds, Del Monte Foods Inc. ("Defendant") sells "Diced Peaches In 100% Juice" in single-serving transparent cups ("Product"), visibly filled with peaches and supposedly only 100% juice, with pictures of a freshly picked peach and peach slices, with what appears to be a wooden background, similar to what one may encounter on a farm.



23.  However, the fine print of the ingredient list, on the back of the packaging, reveals purchasers do not receive only the promised peaches packed "In 100% Juice," but mostly, or at least, a significant percentage of undisclosed ingredients.



**INGREDIENTS:** PEACHES, WHITE GRAPE JUICE (WATER, WHITE GRAPE JUICE CONCENTRATE), ASCORBIC ACID (TO PROTECT COLOR), LEMON JUICE CONCENTRATE, NATURAL FLAVORS.

24.   Though the ingredients, listed in order of predominance by weight, confirm the presence of peaches and juice, they indicate the Product contains mostly, or at least, a significant percentage, of other undisclosed ingredients. 21 C.F.R. § 101.4(a).

25.   These include the sub-components of the second ingredient of "White Grape Juice," "Water, [and] White Grape Juice Concentrate," the third ingredient of "ascorbic acid," the fourth ingredient of "Lemon Juice Concentrate," and the fifth ingredient of "Natural Flavors."

A. <u>Added Water</u>

26.   Though water is a natural component of the peaches and juices used in the Product, the added water is from none of these sources.

27.   Based on the ingredient list, the Product contains more water than all other ingredients except peaches, and more water than any juice ingredient.

28.   One purpose of this significant amount of added water is to reduce the amount of peaches and 100 percent juice consumers receive, because water costs less than peaches and juice.

29.   Water lacks the nutrients and taste of peaches and 100% juice.

B. <u>Added Juice Concentrate</u>

30.   According to Caroline West Passerrello, a registered dietitian nutritionist and a spokesperson for the Academy of Nutrition and Dietetics, juice concentrate is "fruit with the water removed," losing its volume, fiber, natural fruit flavor, and crucial vitamin C, but keeping its sugar and calories.

31.   Vasanti Malik, a research scientist in the Department of Nutrition at the Harvard T.H. Chan School of Public Health, says that "people should view fruit concentrate as an added sugar, similar to high-fructose corn syrup."

32.   After heating the fruit in a vacuum and evaporating the water, the juice is subjected to high temperatures so it can be stored for months and years, and transported around the world.

33.   The intense processing required to store and transport juice concentrate negatively affects its sensory, organoleptic, and nutritive attributes.

34.   The result is that when juice concentrate is "reconstituted," manufacturers often "use additives like flavor packs, which are artificial compounds made from fruit byproducts," among other manufactured compounds, to try and "restore" its "100% Juice" taste and qualities.[11]

35.   Instead of adding back water from the fruits from which these juices were

---

[11] Lisa Wartenberg, MFA, RD, LD, What Is Juice Concentrate, and Is It Healthy?, Healthline.com, July 25, 2023.

made, regular water is added.

36.   Unlike 100 percent juice, the quality of fruits used to make "juice concentrate" "doesn't really matter…Since it's all getting condensed," instead of having the same "high-quality as something you'd juice and use outright."[12]

37.   Juice concentrate is understood by consumers to be of lesser quality than not from concentrate juice, because the former is subjected to harsh processing and long storage, which detracts from what consumers expect of "100% Juice."

C.   Added Flavor and Seasoning

38.   Though natural flavor is defined as "the essential oil, oleoresin, essence or extractive…which contains the flavoring constituents derived from a [] fruit [or juice," this usually contains between 50 and 100 components, with solvents comprising over 80% of its volume. 21 C.F.R. § 101.22(a)(3).

39.   Though natural flavors can be obtained from peaches, the Product's added "natural flavors" are not from peaches, at least not in a way consumers would expect.

40.   To create what many have called this "mysterious additive," scientists in a laboratory isolate, concentrate, and synthesize proteins from the cells and tissue of fruits such as peaches, creating molecular compounds to replicate the taste of

---

[12] Spindrift, Real fruit, never from concentrate.

peaches, using chemicals found in nature.

41.    The result is that a "natural flavor" may contain some oil, protein, or essence from a peach, but mixed with additives and solvents, bearing little resemblance to the peaches it seeks to imitate.[13]

42.    Unfortunately for consumers, a chemical flavor manufactured to mimic the taste of peaches provides none of the health benefits of peaches, like antioxidants, fiber, and vitamin C.

43.    Moreover, according to flavor expert Bob Holmes, an ingredient designated as "natural flavor" is unable to provide "all the flavor depth of the [peach] itself."

44.    In canned or packaged peaches, lemon juice is a widely recognized seasoning ingredient. 21 C.F.R. § 145.170(a)(1)(iii) and 21 C.F.R. § 145.170(a)(4)(i).

D.  Added Synthetic Preservative of Ascorbic Acid

45.    Until the early twentieth century, ascorbic acid was obtained from fruits such as the peaches and 100% fruit juice promoted on the Product's label.

46.    However, the ascorbic acid used in the Product is not from any fruits or fruit juices.

---

[13] Roni Caryn Rabin, Are 'Natural Flavors' Really Natural?, New York Times, Feb. 1, 2019.

47.   Instead, this ascorbic acid is the synthetic version of vitamin C, obtained from genetically modified corn. 21 C.F.R. § 182.3013 ("Chemical Preservatives"); 7 C.F.R. § 205.605(b)(6) ("Synthetics allowed.").

48.   The glucose from the corn undergoes chemical reactions including hydrogenation, with synthetic substances, then is converted to sorbitol, before ascorbic acid is made.

49.   Ascorbic acid is a recognized preservative, a type of additive which slows deterioration of food, and makes it appear of higher quality than it is.

50.   The FDA, aware of consumer desire for foods without preservatives, advised the public to check if a food's ingredients include the chemical additives of "[A]scorbic acid."[14]

51.   This type of ingredient is required to be followed by a description of its function, so consumers can make informed choices, "e.g., 'preservative', 'to retard spoilage', 'a mold inhibitor', 'to help protect flavor' or 'to promote color retention'." 21 C.F.R. § 101.22(j).[15]

52.   Ascorbic acid is a "chemical[s] that, when added to food, tends to prevent or retard deterioration thereof" and functions in this capacity in the Product. 21 C.F.R. § 101.22(a)(5).

---

[14] Overview of Food Ingredients, Additives & Colors, Apr. 2010.
[15] The label complies in this respect.

53.   Ascorbic acid is used in a canned or packaged fruit product as a preservative, performing as an acidulant, chelating agent, antimicrobial agent, buffering agent, antioxidant additive and anti-browning agent, described in the ingredients as "to protect color."

54.   The addition of ascorbic acid allows a canned or packaged fruit product to last longer on the shelves after being made, and after it is opened for consumption.

55.   Ascorbic acid also provides a fruity and tangy taste.

56.   This is necessary in part because highly processed juice concentrate loses some of its natural fruit flavor.

57.   Ascorbic acid is used in the Product to make it seem as if it contains more fruit and 100% juice than it does, by providing a fruity and tangy taste.

58.   Ascorbic acid is used in the Product to make it seem of higher quality, by protecting the color of the fruit and juice used.

## IV.  LABELING IS MISLEADING

59.   The consumer protection statutes of New York are based on the standards of the Federal Trade Commission ("FTC"), which recognizes the effect of advertising includes not just representations made or suggested by words and images, "but also the extent to which [it] fails to reveal facts material in the light of such representations." 15 U.S.C. § 55(a)(1).

60.   In considering whether a food's label is misleading, it is required to

consider not only representations made or suggested by words and images, but also the extent to which the labeling fails to prominently and conspicuously reveal facts relative to the proportions or absence of certain ingredients or other facts concerning a food's ingredients, which facts are of material interest to consumers.

61. The Product is "misbranded" and misleads consumers because its labeling as "Diced Peaches in 100% Juice" causes them to expect only peaches and 100% juice, when this statement and accompanying images are false and misleading, due to the presence of added water, juice concentrates, flavoring, seasoning, and the synthetic preservative of ascorbic acid. 21 U.S.C. § 343(a)(1); AGM § 201(1).

62. The Product is "misbranded" and misleads consumers because even though it is labeled as "Diced Peaches in 100% Juice," causing purchasers to expect only peaches and 100% juice, it substitutes these ingredients with added water, juice concentrates, added flavoring and seasoning, and the synthetic preservative of ascorbic acid. 21 U.S.C. § 343(a)(1); AGM § 201(1).

63. Substituting added water, juice concentrate, added flavoring and seasoning, and the synthetic preservative of ascorbic acid, for peaches and 100% juice is of material interest to consumers, because peaches and 100% juice cost more than these lower quality alternatives.

64. Substituting added water, juice concentrates, added flavoring and seasoning, and the synthetic preservative of ascorbic acid, for peaches and 100%

juice is of material interest to consumers, because peaches and 100% juice contain more nutrients and are natural ingredients, while added water, juice concentrate, added flavoring and seasoning, and the synthetic preservative of ascorbic acid, contain fewer, if any nutrients, and are made through industrial manufacturing and in laboratories.

65.    The Product is "misbranded" and misleads consumers because "Diced Peaches in 100% Juice," in single-serving transparent cups, appearing to show peaches in only juice, with pictures of a freshly picked peach and peach slices, with what appears to be a wooden background, like what one may encounter on a farm, fails to prominently and conspicuously reveal facts relative to the proportions or absence of peaches and 100% juice. 21 U.S.C. § 343(a)(1); AGM § 201(1).

66.    This is because it fails to disclose that it contains mostly, or at least, a significant percentage, of other ingredients besides peaches and 100% juice.

67.    The Product is "misbranded" and misleading because the name of "Diced Peaches in 100% Juice," includes or suggests the ingredients of peaches and only 100% juice, but does not include water, juice concentrate, added flavoring and seasoning, and the synthetic preservative of ascorbic acid, even though these are identified on the ingredient list in fine print. 21 U.S.C. § 343(a)(1); AGM § 201(1); 21 C.F.R. § 101.18(b).

68.    The Product is "misbranded" and misleads consumers because "it

purports to be or is represented as a food for which a definition and standard of identity has been prescribed," but does not "conform[] to such definition and standard, [nor does] its label bear[] the name of the food specified in the definition and standard." 21 U.S.C. § 343(g); AGM § 201(7).

69. As a food subject to the "Canned peaches" standard of identity, its labeling is required to conform to this standard. 21 C.F.R. § 145.135.

70. The name of "Diced Peaches" fails to "include a declaration of any flavoring that characterizes the product as specified in [21 C.F.R.] § 101.22," because it does not disclose the addition of "natural flavor," added to simulate a peach taste. 21 C.F.R. § 145.170(a)(4)(i).

71. Federal and state regulations require that because the Product is represented as "Diced Peaches," yet uses "natural flavor" to imitate and simulate the taste of peaches, "Diced Peaches" (1) "may be immediately preceded by the word 'natural' and shall be immediately followed by the word 'flavored'…e.g., 'Natural [Peach] Flavored [Diced Peaches]' or '[Peach] Flavored [Diced Peaches]'" or (2) "Natural Peach Flavored Diced Peaches With Other Natural Flavor" or "Peach Flavored Diced Peaches With Other Natural Flavor," depending on the composition of the "natural flavor." 21 C.F.R. § 101.22(i)(1)(i); 21 C.F.R. § 101.22(i)(1)(iii).

72. Federal and state regulations require that because the Product is represented as "Diced Peaches," yet uses seasoning in the form of lemon juice

concentrate, "Diced Peaches" "shall also include…a declaration of any [] seasoning that characterizes [it] for example, 'Seasoned with [lemon juice concentrate],'… [one] of the optional ingredients specified in [21 C.F.R. §§ 145.170(a)(1)(ii), (iii), (iv) and (v)]." 21 C.F.R. § 145.170(a)(4)(i).

73.   Federal and state regulations require that "the name of the packing medium specified in [21 C.F.R. § 145.170(a)(3)(i)-(ii)], preceded by 'In' or 'Packed in'…shall be included as part of the name [of Diced Peaches] or in close proximity to the name of [of Diced Peaches]." 21 C.F.R. § 145.170(a)(4)(ii).

74.   Since "the liquid portion of the packing media provided for in [21 CFR 145.170(a)(3)(i)-(ii)] consists of" "Fruit juice(s) and water," this must be disclosed as part of the Product's name. 21 C.F.R. § 145.170(a)(4)(ii); 21 C.F.R. § 145.170(a)(3)(i)(b).

75.   Since the packing medium includes "White Grape Juice Concentrate" an "Lemon Juice Concentrate," which is "a combination of two or more fruit juices [both] of which are made from concentrate(s), the words 'from concentrate(s)' shall follow the word 'juices(s)' in the name of the packing medium," such as "In White Grape Juice From Concentrate and Lemon Juice From Concentrate," or "In Fruit Juice From Concentrate." 21 C.F.R. §§ 145.170(a)(4)(ii)(b)-(c)

76.   If "In Fruit Juice From Concentrate" was used to describe the packing medium, and "the names of the fruit juices used d[id] not appear in the name of the

packing medium as provided in [21 C.F.R. § 145.170(a)(4)(ii)(b)], such names [of white grape juice and lemon juice] and the words 'from concentrate,' as specified in [21 C.F.R. § 145.170(a)(4)(ii)(c)], shall appear in [the Product's] ingredient statement," which they do. 21 C.F.R. § 145.170(a)(4)(iii).

77.   Since the packing medium includes "Fruit juice(s) and water," a truthful and non-misleading description of the packing medium could be "In Water, White Grape Juice From Concentrate and Lemon Juice From Concentrate," or "In Water and Fruit Juice From Concentrate," with water listed before the fruit juice from concentrate because it is present in a greater amount. 21 C.F.R. § 145.170(a)(3)(i)(b); 21 C.F.R. § 145.170(a)(3)(ii) (model language for how added water should be disclosed as part of packing medium but when it contains more fruit juice than water).

78.   The Product is "misbranded" and misleads consumers because the front label does not contain the "word[s], statement[s], or other information required," as detailed above. 21 U.S.C. § 343(f); AGM § 201(6); 21 C.F.R. §§ 145.170(a)(4)(i)-(ii).

79.   To the extent the ingredients other than peaches and juice appear on the back of the package's ingredient list, this does not "render [this] likely to be read and understood by the ordinary individual under customary conditions of purchase and use." 21 U.S.C. § 343(f); AGM § 201(6).

80. Instead of "Diced Peaches," the "word[s], statement[s], or other information required" to describe the name of this food, preceding the packing medium, on the front label, was (1) Natural Peach Flavored Diced Peaches, Seasoned with lemon juice concentrate, (2) Peach Flavored Diced Peaches, Seasoned with lemon juice concentrate, (3) Natural Peach Flavored Diced Peaches With Other Natural Flavor, Seasoned with lemon juice concentrate or (4) Peach Flavored Diced Peaches With Other Natural Flavor, Seasoned with lemon juice concentrate. 21 C.F.R. § 145.170(a)(4)(i).

81. Instead of "In 100% Juice," the "word[s], statement[s], or other information required" to describe the packing medium, on the front label, were (1) In Water, White Grape Juice From Concentrate and Lemon Juice From Concentrate, or (2) In Water and Fruit Juice From Concentrate. 21 C.F.R. § 145.170(a)(4)(ii).

82. The Product is "misbranded" and misleads consumers because "it bears or contains [the] chemical preservative[s] [of ascorbic acid] [and does not] bear[] labeling stating that fact," because even though the ingredient list discloses one of its functions with respect to color, this does not "render such statement likely to be read by the ordinary person under customary conditions of purchase and use," because most consumers do not read the fine print ingredients, and/or it is not identified as a chemical preservative. 21 U.S.C. § 343(k); AGM § 201(11); 21 C.F.R. § 101.22(d).

18

## V.   CONCLUSION

83.   By adding water, juice concentrates, flavoring, seasoning, and the synthetic preservative of ascorbic acid, purchasers get less of the peaches and 100% juice promised on the label.

84.   The label statement of "Diced Peaches In 100% Juice" tells purchasers they are buying only peaches in 100% juice.

85.   Instead, consumers get added water, juice concentrates, flavoring, seasoning, and the synthetic preservative of ascorbic acid, resulting in less of the peaches and 100% juice promised on the label

86.   The Product could have included more of the highlighted fruit and 100% juice ingredients but added water, juice concentrates, flavoring, seasoning, and the synthetic preservative of ascorbic acid, because they cost less and/or it substituted for the highlighted ingredients of peaches and 100% juice.

87.   As a result of the false and misleading representations and omissions, the Product is sold at a premium price, around $2.39 for four 4 oz cups, excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

## JURISDICTION

88.   Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

89.   The aggregate amount in controversy exceeds $5 million, including any statutory or punitive damages, exclusive of interest and costs.

90.   Plaintiff is a citizen of New York.

91.   Defendant is a citizen of Delaware.

92.   Defendant is a citizen of California.

93.   The class of persons Plaintiff seeks to represent includes persons who are citizens of a different state from which Defendant is a citizen.

94.   The members of the proposed class Plaintiff seeks to represent are more than one hundred, because the Product has been sold at no fewer than hundreds of retail stores, including grocery stores, big box stores, bodegas, gas stations, warehouse club stores, drug stores, convenience stores, specialty grocery stores, ethnic food stores, gas station convenience stores, and other similar locations in this State and online to citizens of this State.

95.   The Court has jurisdiction over Defendant because it transacts business within New York and sells the Product to consumers within New York from

96.   no fewer than hundreds of retail stores, including grocery stores, big box stores, bodegas, gas stations, warehouse club stores, drug stores, convenience stores, specialty grocery stores, ethnic food stores, gas station convenience stores, and other similar locations in this State and online to citizens of this State.

97.   Defendant transacts business in New York, through the sale of the

Product to citizens of New York from no fewer than hundreds of retail stores, including grocery stores, big box stores, bodegas, gas stations, warehouse club stores, drug stores, convenience stores, specialty grocery stores, ethnic food stores, gas station convenience stores, and other similar locations in this State and online to citizens of this State.

98.  Defendant has committed tortious acts within this State through the distribution and sale of the Product, which is misleading to consumers in this State.

99.  Defendant has committed tortious acts outside this State by labeling, representing and selling the Product in a manner which causes injury to consumers within this State by misleading them as to its contents, origins, type, amount and/or quality, by regularly doing or soliciting business, or engaging in other persistent courses of conduct to sell the Product to consumers in this State, and/or derives substantial revenue from the sale of the Product in this State.

100. Defendant has committed tortious acts outside this State by labeling the Product in a manner which causes injury to consumers within this State by misleading them as to its contents, type, origins, amount and/or quality, through causing the Product to be distributed throughout this State, such that it expects or should reasonably expect such acts to have consequences in this State and derives substantial revenue from interstate or international commerce.

**VENUE**

21

101. Venue is in this District with assignment to the Brooklyn Courthouse because a substantial or the entire part of the events or omissions giving rise to these claims occurred in Kings County, which is where Plaintiff's causes of action accrued.

102. Plaintiff purchased, used and/or consumed the Product in reliance on the labeling identified here in Kings County.

103. Plaintiff first became aware the labeling was false and misleading in Kings County.

104. Plaintiff resides in Kings County.

**PARTIES**

105. Plaintiff Donna Baird is a citizen of Kings County, New York.

106. Defendant Del Monte Foods Inc. is a Delaware corporation with a principal place of business in California.

107. Plaintiff is like most consumers who tries to buy foods which (1) prominently represent they contain 100% of their promoted ingredients, i.e., "100% juice," (2) contain the types of ingredients they are familiar with and will have at home, like fruits and 100% juice, instead of lower quality ingredients, and (3) do not contain additives that are manufactured in laboratories.

108. Plaintiff is like most consumers and looks to the front label of foods to see what she is buying and to learn basic information about it.

109. Plaintiff is like most consumers who tries to avoid additives based on the belief that they are potentially harmful, not natural and unhealthy.

110. Plaintiff understood "Diced Peaches In 100% Juice" to mean only peaches in fruit juice, without any added water, juice concentrates, flavorings, seasonings or synthetic preservatives.

111. Plaintiff understood 100% juice to mean only not from concentrate fruit juice, because in her experience, the use of juice concentrate is typically disclosed on a product's label.

112. Plaintiff read and relied on the label statements of "Diced Peaches In 100% Juice" in single-serving transparent cups, which appeared to show the peaches packed only in juice, with pictures of a freshly picked peach and peach slices, with what appears to be a wooden background, like what one may encounter on a farm.

113. Plaintiff did not expect that in addition to the pictured peaches and 100% juice, the Product's main liquid ingredient would not be juice but water.

114. Plaintiff did not expect the fruit juice used would be juice concentrate, from which the water was removed.

115. Plaintiff did not expect that in addition to peaches and 100% juice, the Product would contain additives, like flavorings and synthetic chemical preservatives, and seasonings.

116. Plaintiff purchased the Product between February 2021 and February

23

2024, at grocery stores, big box stores, bodegas, gas stations, warehouse club stores, drug stores, convenience stores, specialty grocery stores, ethnic food stores, gas station convenience stores, and/or other similar locations, in New York, at or around the above-referenced price.

117. Plaintiff paid more for the Product than she would have had she known it did not only contain peaches and 100% juice, because it contained added water, juice concentrates, flavoring, seasoning, and the synthetic preservative of ascorbic acid, as she would not have bought it or would have paid less.

118. The Product was worth less than what Plaintiff paid, and she would not have paid as much absent Defendant's false and misleading statements and omissions.

119. Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, features, and/or components.

## CLASS ALLEGATIONS

120. Plaintiff seeks to represent the following class:

> All persons in New York who purchased the Product in New York during the statutes of limitations for each cause of action alleged.

121. Excluded from the Class are (a) Defendant, Defendant's board members, executive-level officers, and attorneys, and immediate family members of any of the

foregoing persons, (b) governmental entities, (c) the Court, the Court's immediate family, and Court staff and (d) any person that timely and properly excludes himself or herself from the Class.

122. Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

123. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

124. Plaintiff is an adequate representative because her interests do not conflict with other members.

125. No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

126. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

127. The class is sufficiently numerous, with over 100 members, because it has been sold throughout the State for several years with the representations and omissions identified here.

128. Plaintiff's Counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

## CAUSES OF ACTION

### COUNT I
New York General Business Law ("GBL") §§ 349 and 350

129. Plaintiff incorporates by reference paragraphs 1-74.

130. The purpose of the GBL is to protect consumers against unfair and deceptive practices.

131. This includes making state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection.

132. The GBL considers false advertising, unfair acts, and deceptive practices in the conduct of any trade or commerce to be unlawful.

133. Violations of the GBL can be based on other laws and standards related to consumer deception.

134. Violations of the GBL can be based on the principles of the Federal Trade Commission Act ("FTC Act") and FTC decisions with respect to those principles. 15 U.S.C. § 45 *et seq*.

135. A GBL violation can occur whenever any rules promulgated pursuant to the FTC Act, 15 U.S.C. § 41 *et seq*., are violated.

136. A GBL violation can occur whenever the standards of unfairness and deception set forth and interpreted by the FTC or the federal courts relating to the FTC Act are violated.

137. A GBL violation can occur whenever any law, statute, rule, regulation,

26

or ordinance which proscribes unfair, deceptive, or unconscionable acts or practices is violated.

138. In considering whether advertising is misleading in a material respect, the FTC Act recognizes that the effect of advertising includes not just representations made or suggested by words and images, "but also the extent to which [it] fails to reveal facts material in the light of such representations." 15 U.S.C. § 55(a)(1).

139. In considering whether a food's label is misleading, it is required to take into account, among other things, not only representations made or suggested by statement, word, design, or in any combination, but also the extent to which the labeling or advertisement fails to prominently and conspicuously reveal facts relative to the proportions or absence of certain ingredients or other facts concerning ingredients or attributes of the food, which facts are of material interest to consumers.

140. Defendant's false and deceptive representations and omissions with respect to the Product's contents, peaches and 100% juice, are material in that they are likely to influence consumer purchasing decisions.

141. This is because consumers prefer foods with the wholesome, natural and nutritious ingredients promoted on the Product's front label, peaches and 100% juice, instead of having those ingredients replaced with added water, juice concentrates, flavoring, seasoning, and the synthetic preservative of ascorbic acid

142. The replacement of peaches and 100% juice with water, juice concentrates, flavoring, seasoning, and the synthetic preservative of ascorbic acid, is of material interest to consumers, because (1) the former ingredients cost more than the latter, (2) they seek to avoid lower quality ingredients, which are highly processed, and (3) they seek foods described as "100%," and without additives, for reasons related to health, nutrition, and/or quality.

143. The labeling of the Product violated the FTC Act and thereby violated the GBL because the representations and omissions of "Diced Peaches In 100% Juice" created the erroneous impression it contained only peaches and 100% juice, when this was false, because it contained mostly or a significant quantity of ingredients other than this, such as added water, present in an amount greater than any fruit juice, juice concentrates, flavoring, seasoning, and the synthetic preservative of ascorbic acid.

144. The labeling of the Product violates laws, statutes, rules and regulations which proscribe unfair, deceptive, or unconscionable acts or practices, thereby violating the GBL.

145. Violations of the GBL can be based on public policy, established through statutes, law or regulations.

146. The labeling of the Product violates laws, statutes, rules and regulations that are intended to protect the public.

147. The labeling of the Product violated the GBL because the representations, omissions, and packaging of "Diced Peaches in 100% Juice," in single-serving transparent cups, appearing to show peaches in only juice, with pictures of a freshly picked peach and peach slices, with what appears to be a wooden background, similar to what one may encounter on a farm, when it did not contain only peaches and 100% juice, but added water, juice concentrates, flavorings, seasonings or synthetic preservatives, was unfair and deceptive to consumers.

148. The labeling of the Product violated the GBL because the representations, omissions, and packaging of "Diced Peaches in 100% Juice," in single-serving transparent cups, appearing to show peaches in only juice, with pictures of a freshly picked peach and peach slices, with what appears to be a wooden background, similar to what one may encounter on a farm, when it did not contain only peaches and 100% juice but added water, juice concentrates, flavorings, seasonings or synthetic preservatives, was contrary to the AGM, which adopted the FFDCA and accompanying regulations.

149. The FFDCA and its regulations prohibit consumer deception by companies in the labeling of food.

150. These include the following federal and state laws and regulations described above.

<u>Federal</u>                        <u>State</u>

| | |
|---|---|
| 21 U.S.C. § 343(a)(1) | AGM § 201(1) |
| 21 U.S.C. § 343(f) | AGM § 201(6) |
| 21 U.S.C. § 343(g) | AGM § 201(7) |
| 21 U.S.C. § 343(k) | AGM § 201(11) |
| 21 C.F.R. § 101.18(b) | |
| 21 C.F.R. § 101.22(d) | 1 N.Y.C.R.R. § 259.1(a) |
| 21 C.F.R. § 101.22(i)(1) | |
| 21 C.F.R. § 145.170(a)(4)(i) | 1 N.Y.C.R.R. § 250.1(a) |
| 21 C.F.R. § 145.170(a)(4)(ii) | |

151. Plaintiff believed the Product contained only peaches and 100% juice, even though it contained mostly or a significant amount of other ingredients, such as added water, present in an amount greater than any fruit juice, juice concentrates, flavorings, seasonings and synthetic preservatives.

152. Plaintiff paid more for the Product and would not have paid as much if she knew that it did not contain only peaches and 100% juice, but contained mostly or a significant amount of other ingredients, such as added water, present in an amount greater than any fruit juice, juice concentrates, flavorings, seasonings and synthetic preservatives.

153. Plaintiff seeks to recover for economic injury and/or loss she sustained based on the misleading labeling and packaging of the Product, a deceptive practice under the GBL.

154. Plaintiff will produce evidence showing how she and consumers paid more than they would have paid for the Product, relying on Defendant's representations and omissions, using statistical and economic analyses, hedonic regression, hedonic pricing, conjoint analysis and other advanced methodologies.

155. As a result of Defendant's misrepresentations and omissions, Plaintiff was injured and suffered damages by her payment of a price premium for the Product, which is the difference between what she paid based on its labeling and marketing, and how much it would have been sold for without the misleading representations and omissions identified here.

Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2. Awarding monetary damages and interest;

3. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

4. Other and further relief as the Court deems just and proper.

Dated:   March 23, 2024

Respectfully submitted,

/s/  Spencer Sheehan

Sheehan & Associates P.C.
60 Cuttermill Rd Ste 412
Great Neck NY 11021
(516) 268-7080
spencer@spencersheehan.com

*Notice of Lead Counsel Designation:*

*Lead Counsel for Plaintiff*

Spencer Sheehan

Sheehan & Associates P.C.

*Counsel for Plaintiff*

**Certificate of Service**

I certify that on March 23, 2024, I served and/or transmitted the foregoing by the method below to the persons or entities indicated, at their last known address of record (blank where not applicable).

| | CM/ECF | First-Class Mail | Email | Fax |
|---|---|---|---|---|
| Defendant's Counsel | ☐ | ☐ | ☐ | ☐ |
| Plaintiff's Counsel | ☒ | ☐ | ☐ | ☐ |
| Courtesy Copy to Court | ☒ | ☐ | ☐ | ☐ |

/s/ Spencer Sheehan